## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MISSOURI
## KANSAS CITY DIVISION

| | | |
|---|---|---|
| JANE DOE, K.H. and | ) | |
| JUNE DOE, M.H. | ) | |
| | ) | |
| *Plaintiffs*, | ) | Case No. 4:25-cv-989 |
| | ) | |
| v. | ) | |
| | ) | |
| KANSAS CITY GIRLS ACADEMY; | ) | **JURY TRIAL DEMANDED** |
| and JOHN DOE ENTITITIES 1-10, | ) | |
| | ) | |
| *Defendants*. | ) | |

## PLAINTIFFS' COMPLAINT FOR DAMAGES

COMES NOW Plaintiffs, Jane Doe, K.H. and June Doe, M.H., by and through their counsel, Griffin Purnell LLC, and respectfully allege as follows:

## I. INTRODUCTION

1.     This action arises from the systematic abuse, neglect, exploitation, and forced labor of the Plaintiffs while they were minors and residents at Kansas City Girls Academy ("KCGA"), a facility purporting to provide faith-based "mentorship, personal development, and character-building exercises" to so-called "troubled teens." Plaintiff K.H. attended KCGA from March 2, 2009 until May 2010. Plaintiff M.H. attended KCGA from March 17, 2010 until June 17, 2011.

1

2.     KCGA is a part of the larger Troubled Teen Industry ("TTI"), which is a notorious moniker that has developed to refer to the nationwide network of therapeutic programs that market to so-called "troubled teens," or teens who were struggling with myriad mental health issues, and their families.

3.     Like other TTI facilities, KCGA recruited children, including Plaintiffs, through sophisticated marketing and messaging that promised families that their children would receive safe and therapeutic care in a structured and nurturing environment.

4.     The reality is that, from the moment they arrived at KCGA, Plaintiffs were abused, neglected, humiliated, physically assaulted, spiritually coerced, and forced to perform unpaid labor.

5.     KCGA did this through a systemic method of coercion and control over Plaintiffs and other students, punishing them through discipline, humiliation, food and hygiene restrictions, and other measures to maintain Plaintiffs' compliance with KCGA's demands.

6.     Most egregiously, KCGA told Plaintiffs all of it was God's will for them, that their illnesses were their own faults, and that they deserved whatever pain they felt.

7.     KCGA told Plaintiffs that to question their conditions, or KCGA's prognoses and commands, was to question God, and that to question God would only worsen their conditions and extend their time at KCGA.

8.     KCGA ultimately profited from the abuse and coerced forced labor of vulnerable children, including Plaintiffs, for nearly a year each, while their unsuspecting parents paid KCGA thousands of dollars.

## II. THE PARTIES

9.     Plaintiff K.H. is a resident of Arizona. She was a minor at all times while a resident at KCGA.

10.     Plaintiff M.H. is a resident of North Carolina. She was a minor at all times while a resident at KCGA.

11.     Defendant Kansas City Girls Academy is a 501(c)(3) non-profit organized under the laws of Missouri with its principal place of business at 5506 Cambridge Ave., Kansas City, Missouri 64129.

12.     Defendants John Doe entities 1-10 are entities, including but not limited to insurance companies, management companies, and other business entities, whose identities are presently unknown to Plaintiffs but who may be liable for the acts and omissions alleged herein.

## III.   JURISDICTION AND VENUE

13.   This Court has original jurisdiction pursuant to 28 U.S.C. § 1331

3

because this action involves claims arising from a federal question under 18 U.S.C. §§ 1581, 1584, 1589, 1590, 1594, 1595(a), and 2255.

14. This Court has jurisdiction pursuant to 28 U.S.C. § 1332 because complete diversity exists between Plaintiffs and the Defendants, and the amount in controversy in this case exceeds $75,000.00, exclusive of costs and interest.

15. This Court has general and specific jurisdiction over KCGA because its principal place of business is in Missouri and because the claims in this matter arise out of KCGA's contacts with Missouri.

16. This Court has specific jurisdiction over the claims of all Plaintiffs because their injuries arose from conduct that occurred at KCGA in Missouri and their claims directly relate to that Missouri-based conduct.

17. Venue is proper in this Court pursuant to 18 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims alleged occurred within this judicial district.

## IV. <u>STATEMENT OF FACTS</u>

### A. Teen Challenge is a Missionary Branch of Assemblies of God

18. KCGA is part of the broader Adult & Teen Challenge USA organization.

19. Teen Challenge USA is a Christian-centered network of addiction and mental health resources, that includes residential facilities, such as KCGA.

4

20.     There are hundreds of Adult & Teen Challenge USA residential facilities in the United States.

21.     Teen Challenge USA is a missionary department of the Assemblies of God U.S. Missions.

22.     Assemblies of God pastor David Wilkerson founded Teen Challenge USA.

23.     Teen Challenge USA has had several licensed Assemblies of God ministers on its board of directors.

24.     Teen Challenge USA is divided into regional chapters.

25.     KCGA is part of the Teen Challenge USA Southeast Region ("Teen Challenge Southeast") and operates under the Teen Challenge USA structure through an agreement with Teen Challenge USA.

26.     Teen Challenge Southeast has similarly had several ordained Assemblies of God ministers on its board of directors.

27.     Alan Biggers has been the executive director of Teen Challenge Southeast for over eight years.

28.     Alan Biggers has been a licensed Assemblies of God minister the entire time he has been the executive director of Teen Challenge Southeast.

29.     Assemblies of God, through its ministers, employees, and volunteers, has a reportedly long history of abusing children and covering up the abuse.

5

30.     In an ongoing series titled "Pastors and Prey," NBC News is detailing chronic and rampant abuse by Assemblies of God employees, ministers, and leaders.

31.     The Pastors and Prey series documents a history dating back to at least the 1970s of Assemblies of God ministers being allowed to lead youth groups after substantiated reports of the ministers' physical and sexual abuse of minors.

32.     NBC News reported in its Pastors and Prey series that nearly 200 Assemblies of God pastors, church employees, and volunteer leaders had been accused of abuse over the last fifty years. The abuse involved more than 475 victims, with the overwhelming majority of those victims being children.

33.     NBC News reported in its Pastors and Prey series that abusive Assemblies of God ministers would coerce victims using scripture to warn the victims never to question spiritual leaders.

34.     NBC News reported in its Pastors and Prey series that national Assemblies of God leaders have resisted implementing rules to protect against the abuse of minors because the rules could create legal liability for the organization.

35.     Richard Hammar, the Assemblies of God's general counsel, is quoted in the Pastors and Prey series as saying the legal risks of implementing such rules "outweighed the benefit."

36.     KCGA employs Assemblies of God ministers and/or allows Assemblies of God ministers to volunteer at KCGA.

6

37. KCGA teaches the Assemblies of God doctrine to residents.

38. The Assemblies of God doctrine is "woven through every aspect of a student's experience" at KCGA.

39. KCGA never reported the abuse and exploitation of Plaintiffs to the appropriate authorities or to Plaintiffs' families.

**B. KCGA Falsely Promised A Safe and Therapeutic Environment for Plaintiffs**

40. KCGA and Teen Challenge USA represented to Plaintiffs and their families that KCGA would be a safe and therapeutic environment in which Plaintiffs could heal.

41. Plaintiffs both come from devoutly religious families, and they themselves were both devoutly religious when they arrived at KCGA.

42. KCGA represented itself at all times to Plaintiffs and their families as a religious organization.

43. Plaintiffs' families, in turn, chose KCGA and continued their daughters' enrollment at KCGA for nearly a year, because it was a religious organization with ties to Assemblies of God.

44. Teen Challenge USA promoted its programs as an affordable exception to traditional boarding schools because Teen Challenge USA used "faith-based focus to bring about life transformation."

7

45.    Teen Challenge USA promised to provide "troubled teens," or teens struggling with mental health issues, like Plaintiffs, with the help they needed.

46.    Teen Challenge USA specifically marketed itself as "tailored to teens struggling with behavioral, motivational, or academic challenges" and that its facilities provided "24/7 mentorship and care" to residents, like Plaintiffs.

47.    KCGA made representations similar to those of Teen Challenge USA to Plaintiffs and their families.

48.    KCGA markets itself as a "uniquely transformative" facility that will "lead students towards wholeness."

49.    KCGA markets itself as having trauma-informed staff that "respond with grace, boundaries, and wisdom" to residents.

50.    KCGA, like Teen Challenge USA, specifically marketed to girls who were uniquely vulnerable and susceptible to coercion.

51.    KCGA markets itself as having "great success" helping girls with a myriad of psychological, psychiatric, and social issues, specifically stating it helps teens with negative self-image, a history of self-harm, who are struggling with severe psychological disorders, and who have experienced profound trauma, such as abusive parents or rape.

8

52.     Upon information and belief, KCGA knew that the girls it was marketing to, including Plaintiffs, were uniquely vulnerable to trauma and that they were all especially susceptible to coercion and abuse.

53.     Plaintiffs and their families relied on KCGA and Teen Challenge USA's representations when choosing KCGA and when choosing to continue Plaintiffs' enrollment for nearly a year until KCGA deemed they both "graduated" and could leave.

54.     Teen Challenge USA and KCGA staff expressly promised Plaintiffs' families that KCGA would treat Plaintiffs' specific conditions.

55.     Upon information and belief, KCGA knew its structure and practices would worsen Plaintiffs' conditions and that its promises were false.

56.     KCGA knew both Plaintiffs had been recently hospitalized before admission and that both were reliant on psychiatric medications when they arrived at KCGA.

57.     KCGA promised Plaintiffs parents that it would adequately dispense Plaintiffs' medications.

58.     KCGA believed that psychiatric medications were an affront to God's will, and KCGA believed children should not take them. KCGA did not communicate that belief to Plaintiffs' parents before Plaintiffs enrolled at KCGA.

59.     KCGA abruptly discontinued Plaintiffs' medications within days of their admissions without titration or concern for withdrawal. Both Plaintiffs experienced severe withdrawal symptoms as a result.

60.     KCGA knew before Plaintiff K.H. arrived that she had a medical condition that caused her to faint. K.H. fainted during her intake at KCGA. KCGA ignored her and directed staff and other residents to step over her body rather than help her. When she came to, KCGA staff accused her of faking the faint for attention and refused her requests for medical attention.

61.     KCGA knew at her admission that K.H. suffered from acute periods of mental distress. During one of those acute periods of distress, KCGA staff told K.H. she was possessed by demons and that the noises she heard were literal demons coming to hurt her.

62.     KCGA knew that Plaintiff M.H. struggled with an eating disorder and had been hospitalized for the condition prior to arriving at KCGA.

63.     KCGA promised M.H.'s family that it could help M.H. with the eating disorder. As described herein, KCGA did not help her, and actually made the condition worse.

64.     KCGA told M.H. her eating disorder was a demon inside her.

65. KCGA knew that M.H. was hypersensitive and self-critical before she arrived at KCGA. As described herein, KCGA's abusive and coercive environment was detrimental to M.H. and significantly worsened her psychological health.

66. Neither KCGA nor Teen Challenge USA ever marketed the true reality of KCGA, which was that students were subjected to physical abuse, neglect, food and clothing deprivation, injury, coercion, and continuous forced labor.

67. Neither KCGA nor Teen Challenge USA ever warned Plaintiffs or their families that Plaintiffs would be subjected to physical abuse, neglect, food and clothing deprivation, injury, coercion, and continuous forced labor throughout their stay at KCGA.

68. Neither KCGA nor Teen Challenge USA has ever confirmed, accepted, or acknowledged that Plaintiffs were subjected to physical abuse, neglect, food and clothing deprivation, injury, coercion, and continuous forced labor throughout their stay at KCGA.

69. KCGA and Teen Challenge USA continue to promote and market their abusive practices as uniquely therapeutic and safe.

## C. KCGA Was A Methodically Abusive, Coercive, and Isolating Environment

70. Plaintiffs were minors their entire time at KCGA.

11

71.    As a condition of admitting Plaintiffs, KCGA required Plaintiffs' parents to give KCGA exclusive and unconditional control and custody of Plaintiffs for the entire time Plaintiffs were at KCGA.

72.    As a condition of admitting Plaintiffs, KCGA required Plaintiffs' parents to promise not to interfere with KCGA's custody or management of Plaintiffs while Plaintiffs were at KCGA.

73.    KCGA's immediate and paramount concern for new residents was to gain control of the residents and to begin the foundational practice of forcing residents into compliance with coercion and punishment.

74.    KCGA controlled residents through religious coercion, and emotional, psychological, and physical abuse.

75.    At KCGA, discipline and consequences were the centerpiece of an environment in which vulnerable children were psychologically broken down into compliance starting the moment they arrived.

76.    KCGA immediately stripped all new residents of all rights and necessities upon their arrival.

77.    KCGA referred to rights and necessities as privileges.

78.    Privileges included speaking, using the bathroom, showering, eating food, having access to hygiene products, communicating with family, and sleeping.

79. KCGA tied all privileges to a level system, wherein privileges were "earned" as residents progressed up through levels beginning at Level 1.

80. At level 1, Plaintiffs, as with all other KCGA residents, were immediately placed on "Silence," a status which prohibited them from speaking to anyone but their two Big Sisters.

81. KCGA assigned new residents two Big Sisters at admission. The new residents were the Little Sisters. Big Sisters were residents of KCGA who had been at the facility for a few months.

82. KCGA trained Big Sisters to assume their Little Sisters were lying when they were speaking.

83. K.H. was on Silence her first month at KCGA.

84. M.H. was on Silence her first two weeks at KCGA.

85. KCGA would add on time to a resident's Silence designation for disciplinary infractions, or for speaking out of turn. Some residents were on Silence for months at a time.

86. KCGA forbade Plaintiffs from making eye contact with anyone without permission or from moving or going anywhere without their Big Sisters.

87. Plaintiffs could not use the bathroom or shower without staff or their Big Sisters watching.

88. KCGA removed privileges as punishment. KCGA also moved children back in the level system as punishment.

89. KCGA placed residents, including Plaintiffs, on the status "Restriction of Privileges" as punishment, wherein Plaintiffs lost access to personal belongings, hygiene products, and human contact for weeks.

90. The only way out of Restriction of Privileges was complete and unquestioning compliance with KCGA's commands and rules.

91. KCGA presently markets that it removes privileges for non-compliance.

92. The only way for Plaintiffs to move up levels and to sustain upward movement through the levels was complete obedience with KCGA's commands and rules.

93. KCGA required students to complete all levels before they could graduate, or before KCGA would recommend to families that it was time for their children to leave KCGA.

94. Plaintiffs believed their complete obedience and compliance with KCGA's requirements was the only way for them to ever leave KCGA.

95. KCGA handed out punishments, including the removal of privileges, when staff believed a resident broke a rule.

14

96. KCGA punished girls for Condoning. Condoning meant a resident had ostensibly observed another girl break a KCGA rule and had not reported the infraction to KCGA staff.

97. Condoning led to girls lying to KCGA staff about infractions to curry favor with staff and to avoid punishment.

98. Condoning created a hostile and untrusting environment that was not therapeutic.

99. KCGA created a hostile environment in which residents could be forced to stay at KCGA longer, and their parents to pay more tuition, if other residents retaliated against them and lied to staff as part of Condoning.

100. KCGA states it is committed to ensuring residents are not retaliated against.

101. Other residents lied to KCGA staff about Plaintiffs as part of Condoning, and KCGA punished Plaintiffs as a result.

102. KCGA's rules changed daily, sometimes hourly, and staff enforced them arbitrarily and with favoritism.

103. Plaintiffs were punished for vague conceptual violations like bad body language or ungodly behavior.

104. KCGA used physical punishment and the threat of physical punishment to force students' compliance.

15

105. KCGA violently restrained young girls who broke the rules.

106. KCGA violently restrained teens in front of other residents as a threat.

107. KCGA used violent physical restraints against teenage girls as punishment.

108. Frequently, grown men would use violent physical restraints on minor-aged girls.

109. KCGA also required KCGA residents to restrain or tackle other residents.

110. The violent restraints were performed publicly as a threat to other students.

111. KCGA forced students to engage in punitive and excessive exercise as punishment.

112. As punishment, KCGA forced students to do wall sits, push-ups, burpees, and to run laps, to the point of vomiting, exhaustion, and even fainting, as punishment.

113. KCGA subjected Plaintiffs to "Standing Punishment" wherein Plaintiffs were required to stand motionless for hours, sometimes entire days, without rest.

114. Residents on Standing Punishment who shifted weight, leaned, or showed signs of exhaustion faced escalating punishments and more time in Standing Punishment.

115. Plaintiffs watched girls collapse during Standing Punishment, only to be mocked by other residents and KCGA staff, then made to stand back up and continue with the punishment. Plaintiffs saw this practice as a threat against their own potential noncompliance with KCGA commands.

116. KCGA restricted access to food as punishment, placing girls on a strict ration of bread or canned vegetables and water as punishment.

117. Girls were expected to eat all the food on their plates at every meal.

118. KCGA served the girls disgusting food that was expired and moldy.

119. KCGA served something the residents called "penguin meat," which was believed to be some form of frozen beef.

120. KCGA would serve girls their uneaten food, over the course of several days, even as the food became visibly spoiled.

121. KCGA administered what it called Character Qualities to residents. Character Qualities required residents to write scripture passages out by hand hundreds of times.

122. KCGA required Plaintiffs and other residents to confess their sins in front of all other students in the "Great Room." Refusal to participate in these forced confessions resulted in punishment.

123. KCGA required Plaintiffs to participate in "forced breakthroughs" wherein KCGA staff berated and encouraged other residents to berate Plaintiffs until they broke and admitted alleged spiritual failings. KCGA staff shamed Plaintiffs after their admissions – calling them sinners and Jezebels. Refusal to participate in forced breakthroughs resulted in punishment.

124. KCGA markets these forced confessionals and group attacks as guided group conversations where residents reflect on their journey in a healthy fashion and gain insight from peers while they build confidence.

125. KCGA markets that it does not condone any form of shaming or isolation.

126. KCGA repeatedly shamed Plaintiffs, and it was traumatic for them both.

127. KCGA denied Plaintiffs and other residents medical attention. KCGA told residents they were faking illness to avoid their responsibilities, including the forced labor described herein.

128. KCGA states it prioritizes timely and diligent medical care for all resident health needs.

18

129. KCGA cut off all direct contact between Plaintiffs and their families for their first months at KCGA, limiting Plaintiffs to hand-written letters.

130. KCGA staff screened all outgoing letters and would force residents to re-write letters that mentioned anything negative about KCGA.

131. KCGA forced Plaintiffs to rewrite letters for their parents and to remove all mention of anything negative about KCGA from all letters Plaintiffs sent to their parents.

132. KCGA would edit and rewrite resident letters if the letters mentioned anything negative about KCGA and refused to edit out the negative parts. KCGA also refused to mail unedited letters to students' families.

133. KCGA punished students who refused to edit the letters they sent to their families.

134. Once Plaintiffs earned the privilege of calling their families, KCGA staff listened in on all calls and would pause or end calls if Plaintiffs mentioned anything negative about KCGA.

135. KCGA punished residents who spoke negatively about KCGA on a call with their family.

136. KCGA preemptively told parents during the admissions process that their children were lying if the children ever mentioned anything negative about KCGA.

19

137.  KCGA told parents their children would only mention KCGA negatively to manipulate the parents into removing their children from KCGA.

138.  KCGA told Plaintiffs' parents that if Plaintiffs ever said anything negative about KCGA, that it was a lie and that it was a lie meant to manipulate them into discharging them from KCGA. Plaintiffs' parents relied on KCGA's alleged expertise and believed KCGA.

139.  KCGA restricted residents' ability to talk honestly with their families to keep residents enrolled and working and to keep the tuition payments flowing.

140.  KCGA markets that it will allow students to withdraw from the program with parent approval.

141.  KCGA markets that it is committed to fostering regular communication between residents and their families that the communication is free of coercion or scripting.

142.  KCGA actively worked to prevent withdrawal by preemptively telling parents their children were lying about KCGA's abuse and neglect and restricting residents' communications with their parents.

143.  KCGA's conduct created a highly fearful environment of regular conflict with no trust between residents. KCGA forced Plaintiffs to live in this environment for months, which left them in a state of persistent hypervigilance, fear,

20

and isolation. KCGA fostered Plaintiffs' state and manipulated it to ensure their continuing compliance and enrollment.

144. KCGA told Plaintiffs and other students that their abuse and conditions at KCGA were God's will for them and that the only way Plaintiffs would ever be in God's grace would be to unquestionably submit to KCGA's commands and dogma.

145. KCGA employed no licensed mental health professionals or physicians while Plaintiffs were residents.

146. KCGA staff told residents, including Plaintiffs, that mental illness was simply a failed connection to God and was ultimately demonic.

147. KCGA staff told residents, including Plaintiffs, that their continuing psychiatric symptoms were their own faults because they were not working hard enough to "hear God."

148. KCGA markets that it does not believe in forcing compliance.

**D. Pervasive Forced Labor and Economic Exploitation at KCGA**

149. KCGA required all residents to perform hours of daily manual labor without pay.

150. KCGA punished and threatened to punish any resident, including Plaintiffs, who did not comply with KCGA's forced labor demands.

151. Forced labor at KCGA included, but was not limited to the following:

21

a. Cleaning KCGA facilities, to include vacuuming, dusting, wiping baseboards, hand-mopping floors with rags, cleaning toilets, cleaning an industrial stove, cleaning out refrigerators, cleaning out tampon bins;

b. Kitchen operations, including food preparation and service, washing dishes and trays, cleaning, sweeping, mopping, and restocking supplies;

c. Sweeping and cleaning KCGA property walkways, ramps, and the parking lot;

d. Raking, bagging, and disposing of leaves;

e. Landscaping, pulling weeds, and watering plants and grass;

f. Cleaning out KCGA transport vans, including wiping down floors, windows, and surfaces;

g. Performing quality control inspections with staff, teaching residents how to perform labor, and supervising other residents;

h. Deep cleaning for weeks to ensure the facility was "tour ready" for prospective residents or for family visits.

152. KCGA forced Plaintiffs to perform the above-listed labor, and more, while they were residents.

153. KCGA also transported Plaintiffs and other residents to churches to perform manual labor at the churches. Plaintiffs performed cleaning, landscaping, and general maintenance labor at several churches at the command of KCGA.

154. KCGA forced Plaintiffs and other residents to practice and then perform music at so-called "rallies" at churches to fundraise for KCGA.

155. KCGA forced Plaintiffs to give personal testimonials at rallies to fundraise for KCGA.

156. All forced labor at KCGA was involuntary for Plaintiffs.

157. KCGA punished students, including Plaintiffs, whenever KCGA found their work unsatisfactory.

158. All cleaning and labor were monitored by a KCGA-appointed resident supervisor. The resident supervisor was a resident at KCGA. If the resident supervisor found any work unsatisfactory, the Plaintiffs and other students were punished.

159. Residents performed the forced labor described herein for at least 4 hours every weekday and at least 6 hours each weekend day.

160. KCGA forced students to perform labor while sick or injured.

161. Plaintiffs performed forced labor while sick and injured.

162. KCGA would take away privileges and threaten to take away privileges from residents who refused to work or those work performed unsatisfactory work.

23

163.  As a result of refusing to work, or performing unsatisfactory work, students and Plaintiffs lost access to food, hygiene products, were placed on Silence, were shamed, were made to perform exercise until they were sick and exhausted, or had communication with their families restricted. Plaintiffs believed they would suffer these punishments at any time if they refused to work.

164.  KCGA shamed students who did not comply fully with its forced labor demands.

165.  Plaintiffs believed they would be shamed and punished as a punishment for refusing to work.

166.  KCGA punished residents with more forced labor or changed the labor to be more physically demanding or difficult if residents refused to work or performed unsatisfactory work.

167.  Plaintiffs believed they would be punished by removing privileges if they refused to work. This included food restrictions, the ability to speak, the ability to communicate with their families, and an extension of their time at KCGA.

168.  Plaintiffs believed they would be punished with excessive exercise if they refused to work.

169.  KCGA markets that it never forced residents to participate in any activity.

24

170. Plaintiffs have no recollection of seeing any KCGA employee performing any cleaning at the facility.

171. KCGA never paid Plaintiffs or their families for the hundreds of hours of forced labor that Plaintiffs performed while at KCGA.

172. KCGA received an economic benefit from the forced labor of residents and Plaintiffs by replacing paid employees and reducing operational costs for: (a) custodial and maintenance services; (b) administrative and coordination services; (c) resident and labor supervision, scheduling, and management; (d) marketing and fundraising; and (e) quality control.

173. KCGA required the labor to be performed to exacting and commercial-grade standards.

174. KCGA disguised the work as discipline that promoted a positive peer culture, when in reality the labor served primarily to reduce facility operating costs by replacing paid staff with unpaid minor residents.

**E. Specific Harm to Plaintiffs**

**K.H.**

175. As a direct result of KCGA's conduct, K.H. has suffered injuries, including but not limited to the following:

    a. Severe psychological distress;

    b. Delayed academic progress;

25

c. Lost wages and economic exploitation as a result of performing thousands of hours of unpaid forced labor;

d. Loss of trust of therapeutic institutions;

e. Diagnoses of Post-Traumatic Stress Disorder, severe anxiety, and social agoraphobia;

f. Permanent disability per psychological and psychiatric conditions that her experiences at KCGA either caused or worsened;

g. Loss of faith and connection to God, her family, and her prior church community;

h. Persistent sleep disturbances; and

i. Difficulty forming and maintaining healthy relationships.

**M.H.**

176. As a direct result of Defendants' conduct, M.H. has suffered:

a. Worsening of her eating disorder into a permanent and chronic condition;

b. Severe psychological distress;

c. Delayed academic progress;

d. Loss of trust of therapeutic institutions;

e. Loss of faith and connection to God, her family, and her prior church community;

26

f. Difficulty forming and maintaining healthy relationships;

g. Persistent sleep disturbances; and

h. Lost wages and economic exploitation as a result of performing thousands of hours of unpaid forced labor.

## F. Discovery Tolling

177. Plaintiffs are both entitled to discovery and equitable tolling of all claims.

178. KCGA used extreme and coercive measures to convince Plaintiffs and their families that Plaintiffs' experience at KCGA was all part God's plan and necessary for Plaintiffs to heal.

179. KCGA presented its services as divinely inspired and guided.

180. Plaintiffs and their families were all devoutly religious and believed in KCGA's tactics because KCGA framed it all as God's will.

181. Plaintiffs did not discover until very recently that KCGA's treatment of them was not divinely inspired and that it was, in fact, abuse and neglect. Until this discovery, Plaintiffs firmly believed that their time at KCGA was, in fact, God's will and that they were solely to blame for their conditions after they left KCGA because it was their fault for not being connected to God. Plaintiffs believed this because it is exactly what KCGA instilled in them for months while they were vulnerable and struggling children.

27

182. Plaintiff K.H. is further entitled to discovery and equitable tolling because she was deemed permanently disabled due to her psychiatric and psychological conditions, all of which either manifested at or shortly after her time at KCGA or were significantly worsened by her abuse at KCGA. K.H.'s effective disability date is December 2, 2014, well before the expiration of any of her claims against KCGA.

## V. CAUSES OF ACTION

### COUNT ONE

**Violations of TVPRA 18 U.S.C. §§ 1595 and 1584**
**(Plaintiffs K.H. and M.H.)**

183. Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if restated in full herein.

184. The Trafficking Victims Protection Reauthorization Act, 18 U.S.C. § 1595(a) provides a civil cause of action to trafficking victims like Plaintiffs against "whoever knowingly benefits, or attempts or conspires to benefit, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in…" violation of any section of 18 U.S.C. §§ 1581, *et seq*.

185. Plaintiffs were victims of forced labor trafficking in violation of 18 U.S.C. § 1584.

28

186. Under 18 U.S.C. § 1584, it is unlawful to knowingly and willfully hold another person to involuntary servitude.

187. Defendants knowingly and willfully held Plaintiffs in involuntary servitude in several ways, including but not limited to the following:

    a. Creating and maintaining a system wherein Plaintiffs and all other residents were forced to work against their will;

    b. Requiring Plaintiffs and other trafficking victims to work excessive hours every day;

    c. Retaining the financial proceeds from Plaintiffs' labor and that of other trafficking victims while providing Plaintiffs or other students with no compensation;

    d. Maintaining complete control over Plaintiffs and other survivors throughout the labor arrangement, dictating when, where, and for how long they would work, and under what conditions;

    e. Maintaining complete control over Plaintiffs' and other survivors' living conditions, food, hygiene, and communications with family and expressly conditioning access to all of it on compliance with forced labor demands;

188.   Defendants received financial benefit from the forced labor of Plaintiffs and other survivors in violation of 18 U.S.C. § 1584.

189.   Defendants saved money by using unpaid labor to maintain KCGA.

190.   Plaintiffs suffered damages as a result of Defendants' conduct.

191.   Defendants received a financial benefit from running a business that recruited, exploited, and manipulated children from desperate families and held them in involuntary servitude under the guise of helping the children with their mental health struggles.

192.   Plaintiffs are entitled to compensatory and punitive damages, restitution, attorneys' fees, costs, and any other relief deemed appropriate.

## **COUNT TWO**

### **Violations of TVPRA  18 U.S.C. §§ 1595 and 1589**
### **(Plaintiffs K.H. and M.H.)**

193.   Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if restated in full herein.

194.   The Trafficking Victims Protection Reauthorization Act, 18 U.S.C. § 1595(a) provides a civil cause of action to trafficking victims like Plaintiffs against "whoever knowingly benefits, or attempts or conspires to benefit, financially or by receiving anything of value from participation in a venture which that person knew

or should have known has engaged in…" violation of any section of 18 U.S.C. §§ 1581, *et seq.*

195. Plaintiffs were victims of forced labor through threats of harm in violation of 18 U.S.C. § 1589.

196. Under 18 U.S.C. § 1589(a), it is unlawful to knowingly provide or obtain labor or services by means of: (1) force, threats of force, physical restraint, or threats of physical restraint; (2) serious harm or threats of serious harm; (3) abuse or threatened abuse of law or legal process; or (4) any scheme, plan, or pattern intended to cause a person to believe that they would suffer serious harm or physical restraint if they did not perform such labor or services.

197. Under 18 U.S.C. § 1589(b), it is also unlawful to "knowingly benefit, financially or by receiving anything of value, from participation in a venture which has engaged in the providing or obtaining of labor or services" by the means described in subsection (a).

198. Under 18 U.S.C. § 1589(c)(2) the term "serious harm" means "any harm, whether physical or nonphysical, including psychological, financial, reputational harm…"

199. Defendants violated 18 U.S.C. § 1589 because they obtained Plaintiffs' and other survivors' labor through extreme emotional abuse, serious harm in the way

31

of malnutrition, deprivation, psychological harm, physical harm, force, and threats of serious harm.

200. Defendants further violated 18 U.S.C. § 1589 by employing a systematic discipline system as a scheme to cause Plaintiffs and other survivors to rightly believe they would be subjected to serious harm if they refused to work.

201. Defendants violated 18 U.S.C. § 1589 in several ways, including but not limited to the following:

    a. Creating, implementing, and maintaining a systematic discipline process that used physical and psychological abuse and threats of physical and psychological abuse to coerce and obtain compliance for forced labor;

    b. Threatening to restrict and restricting Plaintiffs' access to food, water, and housing if they did not comply;

    c. Threatening to restrict and restricting Plaintiffs' access to communication with family if they did not comply;

    d. Physically harming students who tried to run or resist in front of Plaintiffs and other survivors;

    e. Threatening Plaintiffs with discipline, and giving out discipline, that included forced labor, forced exercise, and psychological punishment if they did not perform unpaid labor;

32

f. Shaming students who did not comply in front of Plaintiffs and other survivors as a threat to Plaintiffs;

g. Shaming Plaintiffs when they did not comply;

h. Restricting and monitoring Plaintiffs' contact with family members to ensure continuing compliance with forced labor and the steady flow of tuition payments;

i. Threating to restrict and restricting Plaintiffs' ability to speak if they did not comply.

202. Defendants profited financially through these violations, and, as such, are liable under 18 U.S.C. §§ 1589(b), 1595(a).

203. Defendants knowingly received a financial benefit from their violations of the TVPRA by receiving unpaid labor and services that benefited KCGA.

204. Defendants saved money by using unpaid labor to maintain KCGA.

205. Plaintiffs suffered damages as a result of Defendants' conduct.

206. Defendants received financial benefit from running a business that recruited, exploited, and manipulated children from desperate families and obtained the children's labor through serious harm and threats of serious harm under the guise of helping the children with their mental health struggles.

207. Plaintiffs are entitled to compensatory and punitive damages, restitution, attorneys' fees, costs, and any other relief deemed appropriate.

33

## <u>COUNT THREE</u>

### Violations of TVPRA  18 U.S.C. §§ 1595 and 1590
### (Plaintiffs K.H. and M.H.)

208.   Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if restated in full herein.

209.   The Trafficking Victims Protection Reauthorization Act, 18 U.S.C. § 1595(a) provides a civil cause of action to trafficking victims like Plaintiffs against "whoever knowingly benefits, or attempts or conspires to benefit, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in…" violation of any section of 18 U.S.C. §§ 1581, *et seq*.

210.   Defendants benefited from a venture in which Plaintiffs were recruited, transported, and housed for forced labor in violation of 18 U.S.C. § 1590.

211.   Under 18 U.S.C. § 1590(a), it is unlawful to "knowingly recruit, harbor, transport, provide, or obtain by any means, any person for labor or services in violation of this chapter."

212.   Defendants violated 18 U.S.C. § 1590 in several ways, including but not limited to the following:

34

a. Creating and disseminating misleading marketing materials that advertised KCGA as offering legitimate and uniquely therapeutic services to recruit Plaintiffs and other survivors;

b. Misrepresenting that discipline would be therapeutic and that labor would be voluntary;

c. Specifically targeting vulnerable children and their desperate families;

d. Housing Plaintiffs and other survivors at all relevant times during which all violations occurred;

e. Conditioning Plaintiffs' housing on compliance with forced labor demands;

f. Controlling all aspects of Plaintiffs' communication with the outside world and editing letters to remove any negative mention of KCGA or the forced labor;

g. Coercing Plaintiffs and other survivors to provide labor through comprehensive physical, psychological, and spiritual means;

h. Monitoring and controlling Plaintiffs' and other survivors' behavior during forced labor to ensure continued compliance;

i. Transporting Plaintiffs to churches and other locations to perform forced unpaid labor and forced unpaid fundraising activities.

35

213. Defendants knowingly received a financial benefit from their violations of the TVPRA by receiving unpaid labor and services that benefited Defendants.

214. Defendants saved money by using unpaid labor to maintain KCGA.

215. Defendants saved money by using unpaid labor to fundraise for KCGA.

216. Plaintiffs suffered damages as described herein as a result of Defendants' conduct.

217. Defendants received financial benefit from running businesses that recruited, exploited, and manipulated children from desperate families and forced those children into unpaid labor under the guise of helping the children with their mental health struggles.

218. Plaintiffs are entitled to compensatory and punitive damages, restitution, attorneys' fees, costs, and any other relief deemed appropriate.

## COUNT FOUR

**Attempted Violations and Conspiracy to Commit Violations of TVPRA 18 U.S.C. §§ 1584, 1589, 1590, 1594, and 1595 (Plaintiffs K.H. and M.H.)**

219. Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if restated in full herein.

220. While, as alleged above, Defendants violated 18 U.S.C. §§ 1584, 1589, and 1590, in the alternative, Defendants are liable because they attempted to and did conspire to violate 18 U.S.C. §§ 1584, 1589, and 1590.

36

221.   The Trafficking Victims Protection Reauthorization Act, 18 U.S.C. § 1595(a) provides a civil cause of action to trafficking victims like Plaintiffs against "whoever knowingly benefits, or attempts or conspires to benefit, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in…" violation of any section of 18 U.S.C. §§ 1581, *et seq*.

222.   Under 18 U.S.C. § 1594(a)(b) whoever attempts or conspires to violate §§ 1584, 1589, or 1590 shall be punished in the same manner as a completed violation of each section.

223.   Defendants intended to violate, took the necessary steps to violate, and conspired to violate 18 U.S.C. §§ 1584, 1589, and 1590, as more fully alleged herein.

224.   Plaintiffs suffered damages as described herein as a result of Defendant's conduct.

225.   Plaintiffs are entitled to compensatory and punitive damages, restitution, attorneys' fees, costs, and any other relief deemed appropriate.

## COUNT FIVE

## VIOLATIONS OF U.S.C. § 2255
### (Plaintiffs K.H. and M.H.)

226.   Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if restated in full herein.

37

227. The Child Abuse Victims' Rights Act (18 U.S.C. § 2255) provides a civil remedy for minors who suffer personal injuries as a result of certain federal crimes, including forced labor under 18 U.S.C. §§ 1589 and 1590.

228. Plaintiffs were minors while at KCGA.

229. Plaintiffs suffered personal injuries, as described herein, as a result of Defendants' TVPRA violations.

230. Under 18 U.S.C. § 2255, Defendants' TVPRA violations entitle Plaintiffs to recover the following: actual damages, liquidated damages in the amount of $150,000, attorney's fees, costs of litigation, punitive damages, and all other equitable relief as the court determines to be appropriate.

## COUNT SIX

### NEGLIGENCE
### (Plaintiffs K.H. and M.H.)

231. Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if restated in full herein.

232. Defendants owed Plaintiffs a duty of care as minors entrusted to their custody and control for therapeutic purposes.

233. This duty was heightened due to the residential nature of the program and the special vulnerability of the adolescents in Defendants' care.

234. Defendants breached their duty of care through:

    a. Failing to provide appropriate mental health care;

38

b. Failing to provide adequate medical care;

c. Failing to maintain a safe physical environment;

d. Failing to properly hire, train, and supervise staff;

e. Failing to protect Plaintiffs from abuse;

f. Failing to report suspected and actual abuse to Plaintiffs as required by law;

g. Subjecting Plaintiffs to punitive isolation measures;

h. Subjecting Plaintiffs to systemic punishments meant to coerce them into compliance;

i. Preventing Plaintiffs from communicating with their families, editing their communications, and pushing Plaintiffs if they said anything negative to their families about KCGA; and

j. Forcing Plaintiffs to perform unpaid labor for Defendants' benefit.

235. Defendants acted wantonly, recklessly, and with intentional disregard of their duties of care to Plaintiffs.

236. Defendants' breaches and conduct were the proximate cause of Plaintiffs' injuries and damages.

## COUNT SEVEN

### BREACH OF FIDUCIARY DUTY
### (Plaintiffs K.H. and M.H.)

39

237.   Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if restated in full herein.

238.   Defendants stood in a fiduciary relationship to Plaintiffs, who were entrusted to Defendants' care, supervision, and control.

239.   The fiduciary relationship between Plaintiffs and Defendants arose when Defendants solicited, assumed, and maintained complete control and custody over Plaintiffs, including their housing, property, access to food, quality and safety of food, hygiene, water, clothing, medical care, and outside communication with their families.

240.   Defendants created and maintained Plaintiffs' complete dependence and used it as a coercive tool to keep Plaintiffs enrolled and working and their parents paying tuition.

241.   Defendants exercised control over Plaintiffs' ability and desire to leave KCGA and thus ensured continuing control over them through emotional, spiritual, and religious manipulation, false statements, threats, and physical abuse.

242.   Plaintiffs were particularly vulnerable to Defendants' coercion and abuse as devoutly religious teens struggling with mental health issues.

243.   As a fiduciary, Defendants owed Plaintiffs the utmost good faith, loyalty, full disclosure, and care that required them to place Plaintiffs' interests above their own.

40

244. Defendants breached their fiduciary duties to Plaintiffs by the acts and omissions described herein that all amounted to KCGA not acting in the best interests of Plaintiffs.

245. Defendants' breach of their fiduciary duties to Plaintiffs was intentional, premeditated, wanton, and with extreme disregard to Plaintiffs' well-being.

246. Defendants' breaches were the proximate cause of Plaintiffs' injuries and damages.

## VI.  JURY TRIAL

247. Plaintiffs demand a jury trial on all issues.

## VII.  PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief as follows:

A.  That process issue according to the law;

B.  Statutory damages of $150,000 per violation pursuant to 18 U.S.C. § 2255 for Plaintiffs who were minors at the time of the violations.

C.  That Defendants be served with a copy of Plaintiffs' Complaint and show cause why the prayers for relief requested by Plaintiffs herein should not be granted;

D.  That the Plaintiffs be granted trial by jury;

E.  That the Court enters judgment against Defendants for all general and compensatory damages allowable to Plaintiffs;

F.  That the Court enter judgment against Defendants for all special damages allowable to Plaintiffs;

G.  That Plaintiffs recover all possible damages for loss of consortium;

H. That Plaintiffs recover all possible damages for Plaintiffs' injuries and pain and suffering;

I. That the Court enter judgment against Defendants for all other relief sought by Plaintiffs under this Complaint;

J. That the cost of these actions be cast upon Defendants;

K. That the Court grant Plaintiffs such further relief which the Court deems just and proper.

Dated: December 23, 2025

Respectfully submitted,

**GRIFFIN PURNELL LLC**
2037 Airline Rd., Suite 200
Corpus Christi, Texas 78412
(361) 262-1776
(361) 356-4348 Fax
simon@griffinpurnell.com
gareth@griffinpurnell.com
Service: support@griffinpurnell.com

By: */s/ Simon B. Purnell*
    Simon B. Purnell
    MO State Bar No. 67599
    Gareth S. Purnell (*Pro Hac Vice* pending)

*Attorneys for Plaintiffs*

42